Thomas R. LIEBERMANN, Robert Adams, Seth Bartlett, Bruce Gurall, and Phil Francis, as the Board of Directors of MobileToys.com, Inc., Plaintiffs/Counterclaim Defendants,

and

MobileToys.com, Inc., A Delaware corporation, Nominal Plaintiff/Counterclaim Defendant

v.

Anthony FRANGIOSA and Francis D'Ambrosio, Defendants/Counterclaim Plaintiffs.

C.A. No. 19821–NC.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 8, 2002.
Decided: Dec. 4, 2002.

John M. Bader, Thomas S. Neuberger P.A., Wilmington, DE; Peter F. Carr, II, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Plaintiffs and Counterclaim Defendants Thomas R. Liebermann, Robert Adams, Seth Bartlett, Bruce Gurall, and Phil Francis, as the Board of Directors of MobileToys.com, Inc., and Nominal Plaintiff/Counterclaim Defendant MobileToys.com, Inc., a Delaware Corporation.

William O. LaMotte, III, Patricia R. Uhlenbrock, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Michael F. Connolly, John F. Tocci, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA; Joseph L. Demeo, Timothy M. Mitchelson, Demeo & Associates, P.C., Boston, MA, for Defendants and Counterclaim Plaintiffs, Anthony A. Frangiosa and Francis D'Ambrosio.

OPINION

STRINE, Vice Chancellor.

This is an action to determine the proper board of directors of MobileToys.com,

Inc. The plaintiffs – Thomas R. Liebermann, Robert Adams, Seth Bartlett, Bruce Gurall, and Phil Francis – were the directors of the company as of July 30, 2002 and will be referred to as the "Incumbent Board." The defendants and counterclaim plaintiffs are Anthony A. Frangiosa and Francis D'Ambrosio. On July 31, 2002, Frangiosa and D'Ambrosio delivered written consents (collectively the "Written Consent") to MobileToys, which they allege represented sufficient votes to remove the Incumbent Board and replace it with D'Ambrosio. Immediately thereafter, D'Ambrosio appointed Frangiosa to the "New Board" as well. He and Frangiosa then met and agreed to issue instructions to MobileToys' management not to take any steps to alter the capital structure of the firm (the "Instructions").

This case centers on the question of whether the Incumbent Board or the New Board is in office at MobileToys. That question turns most importantly on whether MobileToys had any validly issued preferred stock as of July 31, 2002. Absent any issued preferred stock, the company's only outstanding shares were common shares, of which the Written Consent represented a majority.

In this opinion, I conclude that the only valid stock of MobileToys as of July 31, 2002 was the company's common stock. Although the MobileToys board had purported to issue and sell preferred stock, its efforts were fundamentally flawed because the stock they attempted to sell was invalid. Most critically, that stock was not authorized by the company's certificate of incorporation. Under the teaching of cases like *STAAR Surgical Co. v. Waggoner*,[1] the invalidity of the preferred stock cannot be ignored, notwithstanding the fact that Frangiosa and D'Ambrosio supported the issuance of some of the preferred stock during their earlier service on the MobileToys board and purported to buy some of it themselves. Although Frangiosa and D'Ambrosio – like the other MobileToys directors and advisors at the time – participated in the creation of what can only be regarded as a mess, their participation does not cure the invalidity of the invalid preferred stock.

In the course of so ruling, I also conclude that the Incumbent Board's efforts – through Liebermann and company counsel – to file a certificate of designations (the "Proposed Certificate") after the Incumbent Board had already been ousted were ineffective. The Incumbent Board never properly approved the Proposed Certificate before it was filed, and, at the time of its filing, the New Board had already issued the Instructions, which were inconsistent with the filing. In any event, the Proposed Certificate did not purport to place shares in any particular investors' hands. Later attempts by the Incumbent Board to actually place the shares were invalid for an obvious reason: the Incumbent Board was no longer in office and therefore not in a position to convey shares of the company.

For all these reasons, I conclude that the New Board is the board of directors of MobileToys.

## I.

### A.

MobileToys emerged from prior businesses started by Frangiosa and D'Ambrosio. Frangiosa has focused his career on mobile electronics, which apparently embrace those electronic products specifically designed for use in automobiles. In the late 1980s, Frangiosa established a mobile

1. 588 A.2d 1130 (Del.1991).

electronics company with D'Ambrosio. D'Ambrosio is an ophthalmologist with an active practice. His role in the new company – Sound Solutions – was to provide financing and big picture advice, with Frangiosa running the day-to-day operations.

### B.

Until the late 1990s, Sound Solutions had modest ambitions and fewer than ten employees. It observed no corporate formalities, and was governed informally by its 100% owner D'Ambrosio and its key manager, Frangiosa.

When the Internet fervor of the late 1990s was in full bloom, however, D'Ambrosio and Frangiosa perceived an opportunity to raise significant capital for Sound Solutions and to perhaps share in the lucrative proceeds that flowed to the initial technology investors whose companies made it to the initial public offering stage. The concept for their Internet initiative was the development of a website that would sell advanced mobile electronics products that could be installed by independent dealers located close to the purchasers. D'Ambrosio and Frangiosa set aside the name MobileToys.com.

In 1999, they retained Mark Tarallo of the firm of Holland & Knight in Boston to serve as MobileToy's corporate counsel. Tarallo assisted them in establishing MobileToys as a Delaware corporation. Eventually, Sound Solutions was integrated into MobileToys and ceased to exist as a separate concern.

MobileToy's certificate of incorporation authorized its board to issue up to 6.5 million shares of common stock and 500,-000 shares of preferred stock. Tarallo had advised D'Ambrosio and Frangiosa to include preferred stock in the certificate because venture capitalists who might invest in MobileToys would likely request such stock. Although sophisticated in other matters, D'Ambrosio and Frangiosa were not experts in corporate finance or venture capital, nor were they (as we shall see) vigilant about attending to corporate formalities.

In the spring of 2000, MobileToys sold over $2,000,000 in common stock priced at $1.50 per share. The investors were primarily friends and family members of Frangiosa. Certificates reflecting the issuance of the shares were given to the common stockholders.

By that time, an important development had occurred on the managerial front at MobileToys. Plaintiff Thomas Liebermann had been brought on board as Chief Executive Officer by D'Ambrosio and Frangiosa with the core mission of helping the company obtain venture capital or institutional investor funding. Liebermann was an experienced executive, who pitched himself as expert at helping growth stage companies become public companies or reach a stage at which they can be profitably sold to a bigger concern.

After some time as an interim CEO, Liebermann became full-time CEO of MobileToys in the summer of 2000. Meanwhile, Frangiosa served as the company's Chief Information Officer and ran the product side of the business. D'Ambrosio continued to play only a non-executive role as a director. Although D'Ambrosio was formally the company's Secretary, as a matter of practice Tarallo took the board minutes as "Secretary Pro Tem."

Contemporaneous with Liebermann's acceptance of the CEO position, the MobileToys board was recomposed, based on suggestions largely made by Liebermann. By summer 2000, the board comprised the following individuals:

Anthony A. Frangiosa

Francis D'Ambrosio

Thomas R. Liebermann

Robert Adams

Seth Bartlett

Phil Francis

Sometime thereafter, plaintiff Bruce Gurall joined the board.

## C.

In December 2000, the MobileToys board met to consider a plan to raise financing through a sale of preferred stock.[2] At that meeting, the board resolved to offer 5,000,000 shares of preferred stock for sale, pursuant to the following resolution:

That it is desirable and in the best interests of the Corporation to offer prospective investors of the Corporation (the "Investors") the opportunity to purchase up to 5,000,000 shares (the "Shares") of the Corporation's Series A Convertible Preferred Stock, par value $.01 per share, at an offering price of $0.50 per share (the "Offering"), pursuant to the terms and conditions of the Subscription Agreement substantially in the form presented to the board of directors (the "Subscription Agreement"),

and that the form, terms and conditions of the Subscription Agreement be and hereby are authorized and approved.[3]

Of course, this resolution was problematic because it involved 4.5 million more preferred shares than the MobileToys certificate then authorized. For purposes of clarity, I will refer to the shares the board addressed in its December 2000 meeting as the "First Round Preferred."

In order to address the problem that the charter only authorized 500,000 preferred shares, a large packet of materials was sent to MobileToys' shareholders on December 8, 2000. The packet included a cover letter from Liebermann, which indicated that he, Frangiosa, and other members of the board supported the offering and intended to buy some of the First Round Preferred shares. As an inducement to purchase, the company purported to give buyers who signed up by December 22, 2000 an extra share for each ten they purchased, reducing the purchase price authorized by the board from 50 cents to approximately 45 cents per share for those purchasers.

The packet included what was represented to be a proposed certificate amendment and a subscriber agreement. Recipients were asked to execute a written consent in favor of the amendment

---

**2.** Liebermann had linked his own compensation aims to the preferred stock offering, by insisting on receiving 600,000 shares of company common stock for a penny a share as a condition for staying on as CEO of what he perceived to be a risky, start-up venture that was not in as good a shape as he had been led to believe. There was some board resistance to this idea, given the disparity between the $1.50 price paid by the initial common investors and the penny that Liebermann sought to pay, as well as Liebermann's desire for the company to pay any taxes he incurred as a result.

The MobileToys board discussed Liebermann's desire for stock at its December 1,

2000 meeting but did not take a formal vote on it. The evidence suggests that the board agreed to accede to Liebermann's request subject to prior stockholder approval. Liebermann and Tarallo testified that the board agreed to issue the shares itself, but also to seek shareholder ratification.

Whether or not Liebermann owns 600,000 shares does not affect the outcome of this case and is, I have been led to understand, the subject of litigation elsewhere. For those reasons, I do not opine on that question.

**3.** JX 7 (emphasis omitted).

and the subscriber agreement. Although the December board meeting minutes reflect a resolution approving the subscriber agreement, they do not specifically reference the board's approval of the certificate amendment.

In any event, the proposed certificate amendment would have increased the number of authorized shares to "12,000,000 consisting of (i) 6,500,000 shares of Common Stock ... and (ii) 5,500,000 shares of Preferred Stock ... of which 5,500,000 is designated as Series A Convertible Preferred Stock."[4] Tarallo, who drafted the proposed amendment, acknowledged that the amendment was necessary because the company's existing certificate did not permit the issuance of more than 500,000 preferred shares. As is typical of preferred stock, the First Round Preferred shares were to be granted a liquidation preference, equal to the greater of the purchase price or the per share price that would have been paid if the preferred were converted into common stock before a liquidation event.[5]

The subscriber agreements included a specific statement to the effect that the First Round Preferred shares to be issued had been properly authorized:

(b) *Power; Authorization; Enforceable Obligations.* The Company has all requisite power and authority and the legal right (including all licenses, authorizations, permits, consents and filings required) to execute, deliver and perform this Agreement and to effect the Offering and has taken all necessary action to authorize the Offering and to authorize the execution, delivery and performance of this Agreement. . . .

(c) *Capitalization.* The capital stock of the Company as of the date hereof consists of 5,500,000 shares of Preferred Stock, $.01 par value per share, of which no shares are issued and outstanding, and 6,500,000 shares of common stock, $.01 par value per share, of which 3,601,210 shares are issued and outstanding.

(d) *Authorization and Issuance of Shares.* The issuance of the Shares has been duly authorized and, upon delivery to the Subscriber of certificates therefor against payment in accordance with the terms hereof, such Shares will have been validly issued and fully paid and will be non-assessable, and free and clear of all Claims arising by or through the Company.[6]

After the December 8, 2000 communication, all the members of the MobileToys board eventually agreed to purchase some of the First Round Preferred stock. Aside from directors Gurall and Francis, however, none of the directors – including D'Ambrosio, Frangiosa, or Liebermann – signed subscriber agreements or the written consent. As a result, the requisite consents necessary to adopt the proposed amendment were never secured and no certificate amendment or certificate of designations reflecting the rights of the First Round Preferred was filed. Nor did any of the "purchasing" stockholders ever receive a stock certificate.

## D.

The absence of the necessary authority did not impede MobileToys from accepting cash payments from persons interested in purchasing the First Round Preferred shares. Indeed, on February 9, 2001, the board extended the offer until March 31, 2001 to allow more time for purchasers to

---

4. JX 8 at MTD001058.

5. JX 8 at MTD001061.

6. JX 8 at MTD001088.

buy.[7] Eventually, almost two million shares of First Round Preferred were sold.

Heedless of their non-compliance with important prerequisites to the valid issuance of stock, the MobileToys board assumed that the individuals who had sent in money for First Round Preferred shares were stockholders of the company. Not only that, the board soon sought further financing through the issuance of a second round of preferred ("Second Round Preferred"), without having done anything to assure the validity of the First Round.

On May 23, 2001, the board first discussed the idea of the Second Round. A dispute exists as to whether Frangiosa and D'Ambrosio supported that concept. A draft of minutes for the meeting indicate that the board unanimously approved the following resolution:

> That it is desirable and in the best interests of the Corporation to raise additional capital through the sale of additional shares of Series A Preferred Stock and to revise the proposed terms of the Corporation's Series A Convertible Preferred Stock and offering thereof as may be necessary to attract additional investors (including revising the liquidation preference, incorporating a discount for those shareholders converting their securities from common to preferred, incorporating a discount for those investors who purchase shares by a certain date, and holding the offer open until fully subscribed or closed by Board action) as presented to the Board, and to submit such revised terms in the Amended and Restated Certificate of Incorporation to the Corporation's shareholders for approval.[8]

Whether or not Frangiosa and D'Ambrosio objected, it appears that a majority of the board supported the resolution. Nonetheless, by its own terms the resolution does not purport to adopt the terms of a specific certificate of designations or proposed charter amendment setting forth the rights of the Second Round Preferred. More fundamentally, nothing the board did acknowledged the absence of a certificate amendment authorizing the issuance of the 5.5 million shares in the First Round, much less the issuance of additional shares.

A growing rift between Liebermann and Frangiosa (the reasons for which are not revealed by the record) was widened by action that Liebermann took several months after the May 23, 2001 board meeting. On August 31, 2001, Liebermann sent a letter to MobileToy stockholders soliciting interest in the Second Round Preferred shares. The letter was accompanied by several other documents, *including a new draft certificate amendment, dated as of August 2001,* a subscriber's agreement, a written consent, and an "expression of interest" form. The last document stated:

### EXPRESSION OF INTEREST

Please indicate your willingness to support the proposed amendment to the

---

**7.** At that same meeting, the board, according to the minutes, "continued its consideration" of Liebermann's desire to receive 600,000 shares of common stock at a penny apiece plus the company's agreement to pay any tax consequences. JX 11. The meeting minutes also reflect that the board reiterated its previous "approval" of that transaction, notwithstanding the lack of an approving vote for those shares at the earlier December, 2000 board meeting. The February 9, 2001 minutes do nothing to clarify whether Liebermann would receive the shares absent the stockholder approval that had been sought in the December 8, 2001 packet. JX 11. As discussed in note 2, I need not and do not rule on whether Liebermann owns 600,000 shares of MobileToys' common stock.

**8.** JX 15 at MTD000069—MTD000070.

Certificate of Incorporation of Mobile-Toys Dot, Inc. (the "Company") and if you would be interested in purchasing Series A Preferred Stock by checking the applicable boxes below. **This letter is not binding upon you or the Company and does not constitute an offer to purchase securities, and is being used solely to allow the Company to gauge the level of interest.**

I will will not approve the proposed amendment to the Company's Certificate of Incorporation.

I am interested in purchasing up to $ _____ of Series A Preferred Stock of the Company.[9]

The mailing angered Frangiosa and D'Ambrosio, and certain other members of the board. At the May 23, 2001 board meeting, the board had not considered any specific certificate amendment or offering terms. Without prior consultation with the board, Liebermann, with Tarallo's assistance, prepared the packet and sent it out.[10] In addition, the terms proposed in Liebermann's mailing differed from the First Round Preferred. Investors were offered two bonus shares for each ten preferred shares they bought at fifty cents apiece,[11] as well as a guaranteed liquidation preference of fifty cents a share.[12] Consistent with the earlier subscriber agreements, the new agreements also contained untrue statements indicating that the Second Round Preferred shares had been properly authorized.[13]

At two contentious board meetings held in September, 2001, a majority of the MobileToys' board voted to authorize a sale of the Second Round Preferred stock under the terms outlined in Liebermann's August 2001 mailing. The majority did not include Frangiosa or D'Ambrosio. By that time, the company had apparently accepted some money from investors who received the August 2001 mailing.

On October 9, 2001, Liebermann sent out another mailing, again without prior consultation with the board. In the cover letter, Liebermann indicated that Mobile-Toys had agreed to extend the bonus period until October 31, 2001. He also stated as follows:

> Attached please find an expression of interest form that was sent to you previously. If applicable, please indicate your willingness to invest and/or consent to the necessary changes in the Company's corporate charter by signing the form where indicated and sending it back to the Company.[14]

Contrary to Liebermann's representation, the expression of interest form was not identical to what was sent previously. In an important respect, Liebermann had changed it. To wit, he omitted the highlighted language of the previous expression of interest form that explicitly stated that the form was **"being used solely to allow the Company to gauge the level of interest."**[15] Although equivocal about this at trial, Liebermann eventually conceded that he was the source of the change.

I conclude, based on all the evidence and on my perception of the witnesses, that Liebermann purposely made the change for an obvious reason: he hoped to use any

---

9. JX 16 at PF0219 (bold text in original).

10. Tr. 288.

11. JX 16 at PF0182.

12. JX 16 at PF0189.

13. JX 16 at PF0203.

14. JX 20.

15. Compare JX 16 at PF219 (with this language) (bold text in original) with JX 20 (with this language deleted).

expression of interest forms he received as affirmative votes in favor of the certificate amendment. Recognizing that he had a problem because of the absence of enough votes in favor of the amendment and cognizant of his simmering feud with Frangiosa (and less directly with D'Ambrosio), Liebermann wished to clean up the preferred stock problem he and the other board members had created.[16]

### E.

When the Second Round Preferred offering expired, the company still lacked the necessary consent to amend its certificate and had not therefore filed a charter amendment or certificate of designations as to the Second Round Preferred. Nor did the company have executed subscriber agreements with all the purchasers. Nor did it issue stock certificates to any of them. Despite these major problems the company "sold" over a half a million Second Round Preferred shares.

After receiving Liebermann's October 9 mailing, Frangiosa focused on the absence of proper authorization for the First and Second Round Preferred shares and raised that issue with the board. As of this time period, Frangiosa had many (unspecified) issues with Liebermann, and things at the company were obviously tense. Because of his newly-discovered concern that all the preferred shares were invalid, Frangiosa stopped paying the subscription payments he had agreed to in order to purchase First Round Preferred shares.

The outside members of the board (Adams, Bartlett, Gurall, and Francis) were supposedly charged with examining the disputes involving Frangiosa, and the concerns he had raised regarding the validity of the preferred shares. Although there was talk about fixing the problem, no

solution emerged. Frangiosa never signed a consent approving any corrective certificate amendment, but then again neither did Liebermann. This was consistent with the lack of harmony at the company and the absence of any definitive plan – with supporting implementation documents – to correct the defects in the First and Second Round Preferred.

### F.

On March 18, 2002, Frangiosa resigned all his positions at MobileToys. D'Ambrosio joined him in corporate exile on April 27, 2002, by resigning as director and Secretary. They, however, did not plan on staying there long.

By July 2002, Frangiosa and D'Ambrosio decided to take steps to remove the Incumbent Board. Now believing that the company had no valid preferred stock, they sought to obtain the signatures of stockholders holding a majority of the company's common stock on a written consent to remove the MobileToys board.

As of this time, the Incumbent Board was still figuring out how to deal with the preferred stock. The plaintiffs contend that the Incumbent Board met on July 1, 2002 to authorize the filing of a certificate of designations for 500,000 shares of preferred stock, to be issued in accordance with the company's original certificate. This contention is based largely on the testimony of Tarallo, who indicated that the board met and approved the concept of issuing 500,000 shares of preferred stock with attributes that were designed to leave the buyers of the First and Second Rounds Preferred economically similar to the invalid shares they had unwittingly purchased. To do this, Tarallo proposed designating 500,000 shares with eleven votes per share and with liquidation rights per

---

**16.** Tr. at 274–76.

share that were eleven times the rights granted in the First Round. This proposal would not make the new shares identical in all respects to the shares putatively offered in the First and Second Rounds but would be very close, and Tarallo had reason to believe that the purchasers would not quibble.

As of the July 1, 2002 meeting, however, Tarallo had not finalized a certificate of designations and no final document was voted on. The draft that he testified was shown to the board was just that, a draft, and also explicitly states that "This Statement of Designation was duly adopted by unanimous written consent of the directors in accordance with the applicable provisions of the DGCL." [17] The draft is unsigned and no signed copy was placed into evidence. No minutes of the July 1, 2002 meeting were put into evidence and there is no reliable indication that the board actually voted on a formal resolution approving the filing of a final certificate of designations. At best, one can conclude that the Incumbent Board supported the idea of fixing the problem through the concept that Tarallo had identified but that the Incumbent Board had not actually voted to authorize, by a resolution satisfying 8 *Del. C.* § 151(g), the filing of a specific, final certificate of designations. [18] Indeed, Tarallo himself did not testify that the Incumbent Board formally resolved to have him file a certificate of designations. Instead, he testified that "I felt like they had, yes." [19] When his counsel responded to this odd locution with the question, "I'm sorry?," Tarallo repeated, "I felt like they had, yes." [20]

### G.

After the inconclusive July 1 board meeting, Tarallo continued to work on the certificate of designations, before and after a scheduled vacation and in between working on what he considered to be more exigent matters.

Frangiosa and D'Ambrosio made more substantial progress on their initiative to remove the board. By July 30, they had gathered consents from stockholders, including themselves, controlling a majority of the *common stock* of the company. That is, the Written Consent was premised on the proposition that the company had no valid preferred stock. Although the Written Consent was effective if that premise was true, the Written Consent would not have been effective if the First and Second Round Preferred shares were valid and part of the voting stock of the company.

Early in the afternoon of July 31, 2002, the Written Consent was received by, among other persons, Mark Tarallo. Other copies went to Liebermann, other key officers at MobileToys, and the company's registered agent, Corporation Service Company. By its plain terms, the Written Consent removed all the directors of the company and replaced them with D'Ambrosio.

Tarallo reacted to the Written Consent with the professional equivalent of terror. Knowing that the First and Second Round Preferred were invalid, Tarallo scrambled to take action to validate that stock based

---

17. JX 31 at BG0518.

18. Liebermann's testimony supports the inference that the Incumbent Board had only approved a process for fixing the problem, not a final fix in the form of a specific certificate of designations and a plan for placing the resulting shares in the hands of the First and Second Round Preferred investors. *See* Tr. at 122.

19. Tr. at 380.

20. Tr. at 380.

on his perception that the "Incumbent Board" had charged him to fix the preferred stock problem. Tarallo knew that D'Ambrosio would oppose the filing of a certificate of designations for preferred stock.[21] Realizing that, Tarallo did not seek clarification of his authority from D'Ambrosio. Rather, Tarallo believed that D'Ambrosio and Frangiosa had been part of causing the problem with the preferred stock. He sensed a coming fight and "did not want to be caught in the middle of it."[22] He wanted to "effectuate what the most recent instruction I had from the board was [sic] and be done with it."[23]

To that end, Tarallo instructed a paralegal at his firm, Adam M. Grandy, to file that day the certificate (the previously defined "Proposed Certificate") that Tarallo had been working on.[24] From prior experience, Grandy knew that Tarallo wanted him to file the Proposed Certificate rapidly.[25] But Grandy had not been instructed to pay the extra fee necessary to get the filing actually to the Secretary of State's office on July 31, 2002. Instead, he contacted Corporation Service Corporation ("CSC") and arranged for an ordinary filing "with today's filing date"– i.e., with a filing date of July 31, 2002.[26] From past experience, Grandy knew that if he requested that, the Proposed Certificate would come back with a file date of July 31, 2002 at 9:00 a.m.[27] CSC received the Proposed Certificate at 3:43 p.m. CSC then entered a work order in its system on 4:22 p.m.

Soon after giving Grandy the task of filing the Proposed Certificate, Tarallo left work for the day. After he left, a copy of a letter from Frangiosa, who had been named to the board by D'Ambrosio and together comprised what I have called the New Board, was received in his office and at MobileToys' office. Frangiosa and D'Ambrosio had met telephonically and agreed to send the letter as their first act as the New Board. The letter, written to Liebermann, and copied to Tarallo contained, among other "Instructions," the following:

> *Please take notice that until advised to the contrary, you and the Company's officers are hereby directed not to take any further actions to issue stock or debt in the Company,* or to otherwise encumber any of the Company's assets. This includes, without limitation, a restriction on taking any steps whatsoever to pursue or close on the proposed financing(s) currently under consideration. *To the extent authority to take any such actions has been previously granted by the Company's former Board of Directors, such authority is hereby expressly rescinded and revoked.*[28]

Any reasonable reader of the English language would know that filing the Proposed

---

21. Tr. at 445.

22. Tr. at 445.

23. Tr. at 445.

24. The Proposed Certificate that Tarallo submitted contains a printed signature from Liebermann, which purports to reflect execution on July 8, 2002. Frangiosa and D'Ambrosio do not challenge that dating, although there is reason to doubt that it actually reflects a date on which Liebermann signed the document.

In any event, I conclude that the Incumbent Board never approved the final Proposed Certificate by a resolution, as required by 8 *Del. C.* § 151(g).

25. Tr. 299 & 308.

26. Tr. 298.

27. Tr. 313.

28. JX 24 (bold text in original and italics emphasis added).

Certificate was contrary to the Instructions.

The Instructions were received at both Tarallo's office and at Liebermann's office at MobileToys before the end of the business day on July 31, 2002, to be precise, as of 4:12 p.m.[29] As of that time, CSC had not yet sent the Proposed Certificate to the Secretary of State. Although both Tarallo and Liebermann deny receiving the Instructions before the Proposed Certificate was actually filed with the Secretary of State, I do not credit their testimony, finding it likely that one or both of them had read or been told about the contents of the Instructions before that time.[30] Although Liebermann was out of town on business on July 31, 2002, he was informed by his staff that he had received an important document.[31] Given the nature of the Written Consent, I find it unlikely that Liebermann was not told of its contents. Liebermann admitted that he was back in Boston (home of MobileToys) that day, and I find it likely given the serious implications of the Written Consent that he stopped by his office before heading home and read both the Written Consent and the Instructions.[32]

At 8:42 a.m. on August 1, 2002, CSC actually filed the Certificate with the Secretary of State. CSC received confirmation of the filing from the Secretary of State at 2:01 p.m. Neither Liebermann nor Tarallo made any attempt to stop the filing despite their offices' receipt of the Instructions.[33]

## H.

By its own terms, the Proposed Certificate did not issue shares to anyone in particular. Rather, if valid, the Proposed Certificate simply provided the rights and terms of 500,000 shares of preferred stock that could be issued by the MobileToys board.[34] Recognizing this reality, Liebermann and the Incumbent Board took several steps in the wake of their supposed removal. One of these was the solicitation of written consents from the putative preferred stockholders to reinstall the Incumbent Board and remove the New Board.

The other measure is even more telling. At a meeting on August 12, 2002, the Incumbent Board considered the preferred stock problem again. An agenda of the meeting suggests that the Incumbent Board was to "Vote" on a "Preferred

29. JX 37.

30. I draw this inference for several reasons in addition to those next stated above. First, given the recent receipt of the Written Consent, it is likely that both the MobileToys' staff and Tarallo's office would have been on the alert for additional communications from the New Board. Second, given their motivations and some of the other events in the record, Liebermann and Tarallo's testimony on this score is of doubtful candor. Finally, given modern technology and the nature of being a CEO and corporate lawyer these days, Tarallo and Liebermann are in a weak position to claim that neither of them was informed about the instructions and that neither took steps to ensure compliance. Where were their mobile toys? Altogether it is more likely that neither Tarallo nor Liebermann believed

that the New Board had legitimacy, and, thus, they purposely ignored the Instructions, despite knowing its contents.

31. Tr. at 200–01.

32. Tr. at 207 (Liebermann would "go out of [his] way" to go to the office when returning from a flight if something important was back at the office, but he doesn't recall if he went to the office on the evening of July 31).

33. I find it a bit difficult to believe that the two of them did not speak during this critical period. Both admit to conferring on August 1, 2002, but Liebermann could not "recall" speaking to Tarallo on July 31. Tr. 201.

34. JX 21.

Share Program" and to discuss its "Implementation."[35]  But to call the evidence about this meeting sketchy is to overstate its utility and it is impossible to make any reasoned guess about what happened, except that the Incumbent Board resolved to press forward with a strategy to fix the preferred problem retroactively using the shares described in the Proposed Certificate.  That involved a letter from Liebermann to the putative preferred stockholders of MobileToys stating in pertinent part as follows:

> Enclosed please find a copy of the Preferred Stock Terms adopted by the board of directors of MobileToys dot Inc. The original share certificate can be kept on file at the Company's main office.  Please let us know if you would like us to send you the original or a copy and we would be happy to do so.
>
> *The number of shares which have been issued to you have been reduced* by dividing by 11, however, each of the shares issued to you carries 11 times the preferences (for example, the liquidation preference is $5.50 per share instead of .50, and each share carries a vote equal to 11 shares of common stock).[36]

By this odd mechanism, the Incumbent Board of MobileToys hoped to fix the preferred stock problem, by informing the putative holders that they now owned 500,-000 shares of properly authorized shares that gave them (nearly) identical rights to the shares they thought they owned.  By its own terms, this letter indicates that the Incumbent Board had, through the Proposed Certificate and subsequent actions, effected a reverse stock split.  That is, the Incumbent Board had not, by Liebermann's words, attempted to issue preferred shares for the first time, but instead had effected a reverse split of the First and Second Round Preferred.  If that were not the case, the letter was a less than candid one, because it purportedly advised the First and Second Round purchasers that they were receiving the proceeds of a reverse stock split, when in fact they were (purportedly and contrarily) being issued valid shares for the first time, authorized through a certificate of designations in accordance with the power granted the board by the company's original charter.

These actions are noteworthy for another reason.  They contribute to my conclusion that the Incumbent Board had not acted on a final certificate of designations in early July but had instead simply authorized company staff and counsel to work on a solution that would be brought back to the board for implementation once the necessary papers and work were completed.[37]

## II.

Having recited the relevant facts, I now turn to an examination of their legal significance.  As adverted to previously, the most important issue in the case is whether the First and Second Round Preferred shares were validly issued.  If they were not, the Written Consent was effective to remove the Incumbent Board, unless I agree with one of the confusing arguments made by the Incumbent Board regarding the Proposed Certificate.

At times, the Incumbent Board appears to argue that the Proposed Certificate operated to validate retroactively the First and Second Round Preferred shares that were already in the hands of the purchas-

35.  JX 27.

36.  JX 21 (emphasis added).

37.  Tr. at 235 (Liebermann testifies that the Incumbent Board's August 12, 2002 meeting was intended in part to "complet[e]" the preferred share process and documentation").

ers of those invalid shares. At other times, the Incumbent Board seems to contend (more traditionally, if no less problematically for other reasons) that the Proposed Certificate was effective to defeat the Written Consent because it – in itself – effectively designated 500,000 shares of voting stock and somehow placed that stock automatically in the hands of the First and Second Round Preferred purchasers. Under either argument, the Incumbent Board claims that the Proposed Certificate became effective at 9:00 a.m. on July 31, 2002 – before the Written Consent was received – even though it was not filed with the Secretary of State until August 1, 2002.

Pervading the case, however, is another argument of the Incumbent Board. Namely, that Frangiosa and D'Ambrosio are equitably estopped from denying the validity of the First Round Preferred shares, which they voted to create as directors and which they thought they were purchasing. Regardless of the invalidity of that stock, therefore, the Incumbent Board argues that it must win, because equity should trump the requirements of law.

### A.

■ The basic legal principles applicable to this case are settled. As recently as this year, the Delaware Supreme Court reaffirmed that stock cannot be validly issued and sold by a company unless the board of directors is empowered to take those actions and unless the board of directors exercises its power in conformity with statutory requirements. That decision, *Grimes v. Alteon, Inc.*,[38] represents no innovation in our law, but instead reiterates settled principles, recognized in cases like *STAAR Surgical Co. v. Waggoner*[39] and *Triplex Shoe Co. v. Rice & Hutchins, Inc.*[40] All of these cases are premised on a sensible assumption, which is that the capital structure and ownership of corporations are matters of great importance and should be settled with clarity, and it is, therefore, fitting and efficient to require strict conformity with the statutory requirements for the issuance and sale of stock.[41]

■ A corollary to this jurisprudence is critical to the resolution of this case. Consistent with our law's insistence on adherence to statutory prerequisites to the issuance and sale of stock, our case law has refused to overlook the statutory invalidity of stock even in situations when that might generate an inequitable result.[42] That is, to the extent that stock is invalid, equita-

**38.** 804 A.2d 256 (Del.2002).

**39.** 588 A.2d 1130 (Del.1991).

**40.** 152 A. 342 (Del.1930).

**41.** *Grimes,* 804 A.2d at 262; *STAAR,* 588 A.2d at 1136; *Triplex,* 152 A. at 347.

**42.** This is the clear teaching of *STAAR Surgical Co. v. Waggoner.* In that case, the Court of Chancery held that a company was estopped from denying the validity of shares that were issued to a major stockholder in exchange for valuable consideration, even though those shares were not issued and sold consistent with statutory requirements for formal board action – to wit, the board never "formally" adopted the resolution selling the shares or the certificate of designations for the shares. *Waggoner v. STAAR Surgical Co.,* 1990 WL 28979, at *6 (Del.Ch. Jan. 5, 1990), *rev'd,* 588 A.2d 1130 (Del.1991). The Court of Chancery held that equitable principles prevented the company from denying the major stockholder the benefits of a transaction in which he took risk and which the company understood as involving the issuance of shares to him. *Waggoner v. STAAR Surgical Co.,* 1990 WL 28979, at *5–*6. Based on a broad reading of the venerable *Triplex* case, the Supreme Court held that the Court of Chancery erred by granting "equitable relief 'akin' to specific performance after it concluded that the ... preferred shares were invalid." *STAAR Sur-*

ble claims – such as equitable estoppel – will not help a claimant seeking to vote or to validate that stock. This does not mean that the claimant might not have other recompense if, for example, he believed he had purchased valid stock and had not in fact done so. The claimant might have a claim for equitable rescission or other damages, but cannot use principles of equity to achieve a judicial order validating stock that was not issued and sold in conformity with law.

### B.

Bearing these principles in mind, I now turn to the resolution of this dispute. In essence, the Incumbent Board argues that it remains in power for the following alternative reasons: 1) the First and Second Round Preferred was approved with sufficient formality to make that stock valid; 2) the Proposed Certificate that Tarallo submitted to the Secretary of State through CSC on August 1, 2002 was valid as of the time stamped on the filing and the subsequent efforts of the Incumbent Board to place shares of the stock referred to in the Proposed Certificate in the hands of particular investors were valid; and 3) defendants Frangiosa and D'Ambrosio are estopped from denying the validity of the First Round Preferred because they voted to issue that stock as directors and in fact purchased some of that stock. The last argument permeates the Incumbent Board's entire brief, as they find it unfathomable that Frangiosa and D'Ambrosio – having contributed to the creation of the First Round Preferred – can now use technicalities to undermine that stock's validity and thereby claim control of the Mobile Toys board for themselves, to the (alleged)

detriment of investors who paid good money for shares of the First Round Preferred.

In response to these arguments, Frangiosa and D'Ambrosio advance a simple position. The First Round Preferred stock was not validly issued. Nor was the Second Round Preferred. Therefore, on July 31, 2002, the only validly issued stock of the company was its common stock. By any calculation, the written Consent represented a majority of the common stock and was submitted to remove the Incumbent board and to replace it with D'Ambrosio. This removal, without dispute, occurred before Tarallo attempted to file the Proposed Certificate.

Moreover, before Tarallo's agent, CSC, actually filed the Proposed Certificate, both Tarallo and Liebermann had received the Instructions from Frangiosa (on behalf of the New Board) stating that any previous authorizations regarding the capital structure of the company were rescinded. At the time that CSC filed the Proposed Certificate, these Instructions were the operative policy of the company. And, irrespective of whether the Certificate itself was properly filed, the Certificate did nothing to actually place shares in the hands of particular investors. At best, the Proposed Certificate designated the rights of certain preferred shares that might be sold or otherwise conveyed to particular individuals. Because the Incumbent Board had been replaced, it had no authority to actually issue shares under the Proposed Certificate after July 31, 2002.

Finally, Frangiosa and D'Ambrosio deny that they are guilty of any inequitable

---

*gical Co. v. Waggoner,* 588 A.2d at 1137. In so ruling, the Supreme Court again embraced the rule that "the equitable doctrine of estoppel is inapplicable to agreements or instruments that violate either express law or public

policy." *Id.; see also Superwire.com, Inc. v. Hampton,* 805 A.2d 904, 909 n. 17 (rejecting an estoppel argument because the court "cannot give *any* effect to void shares even in the context of an equitable defense").

conduct that would warrant estopping them from contesting the validity of the First Round Preferred, and note in that regard that plaintiff Liebermann also failed to ever sign a consent in favor of a certificate amendment validating the First Round Preferred or a subscriber agreement. The board-wide failure to comply with required formalities cannot, Frangiosa and D'Ambrosio argue, be blamed entirely on them when Liebermann (whose capital-raising expertise motivated his hiring) and Tarallo also failed to take the necessary steps to do things right. More importantly, they argue that *STAAR* and other cases render equitable defenses impotent to validate void stock.

For the following reasons, I believe that Frangiosa and D'Ambrosio have advanced the more persuasive arguments.

## C.

■ I begin with the First Round Preferred. The First Round Preferred clearly involved the marketing of stock that was not yet authorized by the certificate of Mobile Toys. Indeed, the marketing materials used by the board themselves concede that the First Round Preferred could not be validly issued until the Mobile Toys certificate was amended to authorize the

issuance of those shares. The necessary votes on an amendment were never secured. In view of this defect, it is not surprising that neither a certificate amendment nor a certificate of designations approved by the board were ever filed with the Secretary of State setting forth the attributes of the shares.[43] These are fundamental defects, not trivial technicalities.[44]

The Second Round Preferred is invalid for the same reasons. That stock could not be validly issued absent an amendment to the MobileToys certificate. No such amendment was ever achieved, nor was a certificate of designations filed.

As of July 31, 2002, therefore, the only validly issued stock of MobileToys was its common stock.[45] On July 31, 2002, a majority of the company's valid stock was voted in favor of the replacement of the Incumbent Board with D'Ambrosio. At that time, D'Ambrosio became the sole member of the board of MobileToys. After that time, D'Ambrosio appointed Frangiosa to the board. The two of them then met by telephone and resolved to send a letter to Liebermann and Tarallo revoking any prior resolutions of the board authorizing alterations to the company's capital structure – *i.e.*, the Instructions.[46]

---

**43.**  8 *Del. C.* § 151(g).

**44.**  *STAAR*, 588 A.2d at 1136.

**45.**  The plaintiffs argue that the first 500,000 shares of the First Round Preferred should be treated as valid. There are a variety of problems with that argument. In particular, the First Round Preferred was not approved as an issuance of shares pursuant to a certificate of designations adopted by the MobileToys board with respect to the 500,000 preferred shares authorized in the MobileToys certificate. Indeed, if that were the case, how could the plaintiffs consider the adoption of a later certificate of designations in the summer of 2002 as to those same 500,000 authorized shares? The MobileToys board decided to

obtain authorization for the First Round Preferred through a certificate amendment (that it appears the board never formally approved) that spelled out (with other documents) the rights of the stock proposed in that Round. Having failed to obtain the necessary authority for that Round, the shares the company "sold" without proper authorization are not valid. In any event, validating the initial 500,000 shares in the First Round would not change the result.

**46.**  During trial, the plaintiffs did not appear to argue that there was some technical defect in this instruction based on a lack of formality in the meeting held between Frangiosa and D'Ambrosio. Thus, their post-trial argument

Tarallo's attempt to thwart this change of control by filing the Proposed Certificate is unavailing for several reasons. First, the better reading of the evidence is that the Incumbent Board never approved the Proposed Certificate that Tarallo filed through the adoption of a formal resolution approving that document. At most, I conclude that the MobileToys board approved the concept of fixing the preferred stock problem by means of a mechanism like the one Tarallo suggested. But, as of July 31, they had not in fact voted to approve a final certificate of designations.[47] Indeed, the only evidence of what the Incumbent Board considered at its July 1, 2002 meeting is a draft "Statement of Designation" that contemplated later board signatures, which were never obtained. Because the Incumbent Board never adopted a resolution approving the certificate of designations that Tarallo sought to file, that document was not valid.

Even if the Incumbent Board had properly approved the filing of the Proposed Certificate (which it, I find, did not), that authorization was no longer effective as of the time that CSC filed the document with the Secretary of State. By that time, both Liebermann and Tarallo had received specific Instructions from the New Board inconsistent with the filing of the Certificate. Even if those Instructions were received after Tarallo first spoke with Grandy, neither Tarallo nor Liebermann acted to halt the filing after the receipt of the Instructions, which came well in advance of the actual filing by CSC. I find unconvincing their assertions that they received the Instructions after it was too late to do anything. Instead, an alternative account is much more convincing. To wit, both Tarallo and Liebermann knew that the New Board would not want the Proposed Certificate filed. This knowledge is what impelled Tarallo into rapid action. Once this knowledge was confirmed, neither Tarallo nor Liebermann attempted to stop the filing. The proposition that neither of them was alerted to the letter from Frangiosa before the morning of August 1, 2002 is improbable, given the earlier receipt of the written consents, and I infer that one or more of them knew about the Instructions soon after they were delivered. While both would like to have been blind to the New Board's wishes, I doubt that either was and conclude that both wished to take whatever steps they could to preserve the Incumbent Board in office.

Nor am I persuaded by the Incumbent Board's contention that the Proposed Certificate is valid because it is stamped by the Secretary of State with a filing time of 9:00 a.m., July 31, 2002. The evidence reveals that the Secretary of State's Office has a practice of permitting parties to ask for a particular filing date and of honoring their requests, irrespective of whether the request diverges from temporal reality. Hiding behind this administrative practice, the Incumbent Board would have me ignore the reality that the Proposed Certificate was not in fact filed with the Secretary of State until shortly before 9:00 a.m. on August 1, 2002 – after the New Board

---

that the instruction was not properly authorized at a formal board meeting was somewhat surprising to the court. In any event, the testimony is clear and credible that the New Board members met and agreed to send the precise letter at issue. That they did so telephonically and without prior written notice is not important. *8 Del. C.* §§ 141(i), 229.

47. *8 Del. C.* § 151(g) (requiring board approval of certificate of designations of preferred stock); *STAAR,* 588 A.2d at 1137 ("[A] board's failure to adopt a resolution and certificate of designations, amending the fundamental document which imbues a corporation with its life and powers, and defines the contract with its shareholders, cannot be deemed a mere 'technical' error.").

was in place and after the Instructions had been received at MobileToys and at Tarallo's law firm. The Incumbent Board bases this unusual request on a statute, 8 *Del. C.* § 103(c)(3), which states:

> Upon delivery of the instrument ... *the Secretary of State shall certify that the instrument has been filed in the Secretary of State's office by endorsing upon the original signed instrument* the word "Filed," and *the date and hour of its filing.* This endorsement is the "filing date" of the instrument, and is conclusive of the date and time of its filing in the absence of actual fraud.[48]

The Incumbent Board argues that Tarallo and CSC were simply taking advantage of the flexibility afforded to filers by the Secretary of State's Office and that there was therefore no actual fraud. I reject this argument.

For starters, § 103(c)(3) itself mandates that the Secretary of State's office certify the "date and hour" of a filing, a requirement that clearly contemplates a good faith effort to record the actual time at which a document is filed. Although the Secretary of State undoubtedly has well-intentioned reasons for its current practice (which is of venerable origins), the practice conflicts with the plain language of the statute and creates the potential for abuse, as this case shows.[49] When Tarallo sought (through Grandy and CSC, who were unwitting of Tarallo's motivations) a filing date of July 31, he (I conclude) knew that the requested July 31, 2002 filing stamp would (by prior experience) include the time of 9:00 a.m., a time predating the Written Consent. By attaining such a time of filing, Tarallo would obtain room for the Incumbent Board to argue that the Certificate was effective before the New Board took office, when Tarallo knew that it was filed after the Incumbent Board was ousted. To my mind, procuring a filing time that is actually false in circumstances when timing is material is actual fraud within the meaning of § 103(c)(3). The actual fraud safeguard within the statute was likely intended to deal with situations just like this, when the date recorded by the administrative agency is in fact erroneous and has been obtained wrongfully by a party seeking to use the false time stamp to the detriment of proper corporate governance.[50]

Furthermore, the mere validity of the Proposed Certificate would not have any effect on the outcome of this case.[51] As of July 31, 2002, the New Board was in and the Incumbent Board was out. Even if

---

48. Emphasis added.

49. With advances in technology, the Secretary of State's office is better-positioned than ever to record the actual time of filing with fidelity and accuracy, and doubtless will set in motion revised practices to effect this result, having experienced the chagrin of seeing its current policies generate litigable arguments.

50. Without delving into this troublesome subject, I also sense that the Incumbent Board would have been pleased if the court did not know the actual time the Proposed Certificate was filed. Its responses to discovery on this point were less than forthcoming.

51. As one of their myriad of alternative, and mutually inconsistent, arguments, the plaintiffs contend that the Proposed Certificate in July 2002 somehow related back to validate at least the First Round Preferred. For many reasons well articulated by the defendants in their briefs, this cannot be so. Most fundamentally, by its own terms, the Proposed Certificate is prospective in nature. The Proposed Certificate also dealt with many fewer shares and those shares had rights and attributes that were not identical to those putatively attached to the shares in the First and Second Rounds. In this regard, I also note Liebermann's August 2002 communication purporting to "reduce" the number of shares issued in the First and Second Rounds, a strange method of validating them.

the certificate of designations was valid – which it was not – that certificate did not place shares of stock in anyone's hands. At best, it set the rights of shares that could be placed with investors and, given appropriate measures, those investors could have included the investors who thought they were purchasing shares in the First and Second Rounds. To actually convey the (treasury) shares referenced in the Proposed Certificate, however, the MobileToys board needed to take formal action[52] and the relevant board as of that time was the New Board, not the Incumbent Board. Because of this reality, the attempt by Liebermann, after a meeting of the Incumbent Board on August 12, 2002, to put shares in the hands of the investors in the First and Second Rounds was unauthorized.

In view of these factors, the only remaining issue is whether the "equities" somehow override the fact that the New Board came to power through a Written Consent representing a majority of the validly issued shares of MobileToys. Given the clear teaching of *STAAR*, I will not burden the reader with an extended consideration of the Incumbent Board's equitable arguments. Rather, I rely upon the rule of *STAAR*, which forecloses the assertion of equitable claims to validate stock that was not issued and sold in conformity with statutory requirements.[53]

Although it might be galling to the plaintiffs to have Frangiosa and D'Ambrosio take advantage of a legal problem they contributed to creating, the inequity that results is no greater than that which occurred in *STAAR*, wherein a purchaser who had accepted substantial economic risk in exchange for shares was denied the benefits of the bargain he thought he made by the company with whom he had made it. In regard to the equities, it is also important to recognize that Frangiosa and D'Ambrosio are no more responsible than the Incumbent Board for the invalidity of the First and Second Round Preferred.

Even more critical, my recognition of the New Board as the proper board of MobileToys does not leave the investors in the First and Second Round without a remedy (particularly those investors who were not directors and officers of the company). Frangiosa and D'Ambrosio will now bear primary responsibility for directing MobileToys' response to this substantial legal problem, which exposes the company (and perhaps its directors) to rather obvious claims (*e.g.*, for equitable rescission or unjust enrichment). Another court on another day may well confront disputes arising out of the New Board's decisions, if it is unable to address the purchasers' concerns in a manner that generates a consensus. For now, I simply decide that Frangiosa and D'Ambrosio, rather than the Incumbent Board, are the directors of MobileToys.

### III.

For all the foregoing reasons, judgment shall be entered in favor of the New Board. The parties shall submit a conforming order within five days.

---

52. *Grimes*, 804 A.2d at 261 (directors must fix consideration for sales of stock and approve the sale).

53. 588 A.2d at 1137. In this respect, I also reject the Incumbent Board's request for me to equitably reform the MobileToys' certificate on the assumption that a majority of the stockholders intended to, but did not, consent to an amendment validating the First Round Preferred.