# United States Court of Appeals
## For the First Circuit

---

No. 99-2367

DAVID B. OSTLER,

Plaintiff, Appellant,

v.

CODMAN RESEARCH GROUP, INC. and S. PHILIP CAPER,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

---

Before

Torruella, Chief Judge,

Boudin and Lipez, Circuit Judges.

---

W.E. Whittington with whom Whittington Melendy & Girdwood, P.C. was on brief for appellant.

Bruce E. Falby with whom Kirsten Nelson Callahan and Hill & Barlow were on brief for appellees.

---

March 2, 2001

---

BOUDIN, Circuit Judge. Plaintiff David Ostler appeals after a jury verdict against him in a case growing out of his decision not to exercise stock options he held in Codman Research Group, Inc. ("Codman"). Codman made software for the health care industry and Ostler held various positions at the company from 1985 until 1995, serving as its president from 1989 to 1993. Under Codman's 1988 stock option plan, Ostler received options to purchase 60,000 common shares of Codman at one cent per share (adjusted for a stock split subsequent to the initial grant). The options were to expire in ten years, on July 27 or 28, 1998 (the exact date is disputed but of no consequence).

Ostler left Codman in 1995. To exercise his stock options, the 1988 plan required Ostler to certify that he had "fully investigated" and had knowledge of Codman's "current corporate activities and financial condition." Thus, on February 19, 1998, Ostler wrote to Codman requesting pertinent information. What Ostler needed most was information concerning the valuation of Codman's stock and the chance that Codman would either "go public" or merge into a public company and create a market for its shares.

Between March and early June 1998, Codman sent a number of documents to Ostler. Regarding the disclosure as inadequate, Ostler brought suit in federal district court against Codman and

-2-

its board on June 8, 1998, seeking preliminary injunctive relief on breach of contract grounds.  In June and early July 1998, Codman supplied further documents to Ostler and advised him that if he exercised his options, Codman would require him to tender (in addition to the $600 exercising the options would cost) federal income and other taxes on the difference between the price of the options and the much larger fair market value of the Codman shares at the time of exercise.  The 1988 plan so provided, and Codman declined to defer the payment obligation or to loan Ostler the money (as it had apparently done for current employee option-holders).

On July 24, 1998, Codman gave Ostler a draft report prepared by outside accountants estimating its per share value at $16.94, and, on July 27, Codman told Ostler that the taxes that would be due from Ostler on exercise of his options would be over $300,000.  Later that day, learning that the final valuation would likely be reduced by a "material amount," Codman management--without obtaining board approval--told Ostler that the company would "unilaterally extend" the option exercise deadline to 48 hours after a final report was delivered.  On July 28, Ostler was given the final report, with a valuation of $14.53 per share.

On July 29, 1998, Codman management--again without board approval--extended Ostler's option exercise deadline to noon on July 31. On the same day, Codman told Ostler that it was engaged in preliminary discussions regarding a possible merger with HealthTech Services Corporation ("HealthTech") (then known as CareMonitor, Inc.) and provided Ostler some pertinent documents. Codman had not earlier revealed its discussions with HealthTech because, it says, the possibility of a merger was remote until a breakthrough on July 28.

Although both Ostler and Codman valued the stock at well above its option price, difficulty in marketing the stock and Codman's financial troubles made exercising the options a gamble. Ostler debated until the last minute, consulting his father and his lawyer, but did not exercise his options by noon on July 31, 1998. Instead, he unsuccessfully sought another extension. On October 9, 1998, Codman and HealthTech signed a merger proposal, and the merger was ultimately consummated on January 27, 1999. If Ostler had exercised his options, he says that his stock would have been worth millions, at least for a period after the merger.

In September 1998, Ostler amended his complaint in the federal action to assert damages claims of securities fraud and new breach of contract claims based on inadequate and misleading

disclosure (the original claims, which were dismissed before trial, were based on differential terms of exercise as between Ostler and current Codman employees).  After discovery, the case went to trial in late October 1999.  On November 3, 1999, the jury returned a  verdict for the defendants, finding specially that Codman had extended the option exercise date to July 31.  After his post-trial motions were denied, Ostler brought the present appeal.

Ostler's main claim on appeal is that the extension by Codman's management of Ostler's option exercise deadline to July 31, 1998, was invalid.  If so, Ostler argues, the final valuation report (assuming the initial expiration date was July 27) and documents alerting Ostler to a possible HealthTech merger--delivered after the original deadline but before July 31--should not count toward satisfying Codman's disclosure obligations under the 1988 plan and securities laws.  Despite Codman's claim to the contrary, Ostler preserved this argument for appeal by, <u>inter alia</u>, asking the district court to withdraw from jury consideration the question whether Codman had extended the deadline.  <u>See</u> <u>Play Time</u> v. <u>LDDS Metromedia Comms., Inc.</u>, 123 F.3d 23, 29 (1st Cir. 1997).

Codman was a Delaware corporation at the time of the critical events in July 1998, and the parties agree that

Delaware law governs the question whether Codman management could extend Ostler's period for exercising his options without board approval.[1] Section 157 of the Delaware General Corporation Law provides that the terms of options, including the time for exercise, shall be determined (if not in the certificate of incorporation itself) by the board of directors. Del. Code. Ann. tit. 8, § 157 (1998). Ostler contends that this provision legally barred the extension to July 31 by Codman management.

Several Delaware cases have read section 157 to require board approval for fundamental actions such as the creation of options, Sai Man Jai, Ltd. v. Personal Computer Card Corp., Civ. A. No. 11579, 1991 WL 110458, at *2 (Del. Ch. June 18, 1991); a substantial reduction in the exercise price, Liberis v. Europa Cruises Corp., Civ. A. No. 13103, 1996 WL 73567, at *7-*8 (Del. Ch. Feb. 8, 1996); or swapping new options for old ones, Michelson v. Duncan, 407 A.2d 211, 224 (Del. 1979). On the other hand, a Delaware court recently held that a company was bound by an executive's promise to an employee contemplating early retirement that he could exercise his stock options anytime during the pertinent plan's ten-year term,

---

[1]For reasons that do not matter here, the parties deemed New Hampshire law to control a related estoppel issue, but New Hampshire and Delaware law seem to be the same as to estoppel doctrine so far as pertinent to this case.

-6-

notwithstanding a special ninety-day deadline from date of termination for early retirees. See Collins v. American Int'l Group, Inc., Civ. A. No. 14365, 1998 WL 227889, at *6 (Del. Ch. Apr. 29, 1998).

Collins may suggest that a minor extension of an option exercise deadline by management is permitted under Delaware law, but it is hardly conclusive.[2] One might think that most boards would expect management to make minor adjustments to cope with last-minute emergencies, see 2 Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 443 (perm. ed., rev. vol. 1998). Still, corporate law remains fairly fussy about the actual authority of officers when their actions affect stock options. Cf. Michelson, 407 A.2d at 223-24.

However, courts have commonly used apparent authority and estoppel doctrine to protect those who have relied on corporate officials later found to have lacked actual authority. See 2 Fletcher, supra, §§ 437, 449. Although in most cases estoppel is invoked against the company, see id. § 437.100, there is no obvious reason why the doctrine should not work both

_____

[2]It is not clear in Collins whether the 90-day deadline was part of the option plan or who had authority to alter the deadline; nor did the court expressly discuss section 157. Rather, the court adverted only briefly to the company's claim that shareholder approval was needed. Collins, 1998 WL 227889, at *1.

ways, cf. 7A Fletcher, supra, § 3409. It would be ironic if rules limiting the authority of corporate officers--rules designed to protect the company and its shareholders--could be overriden by estoppel doctrine only where this _disadvantaged_ the company. Here, we think that estoppel doctrine is a ground for affirmance.

Indeed, the district court did _not_ instruct the jury that Delaware law freely permitted management to deviate from the terms of the 1988 option plan as prescribed by the board. Instead, the court gave a form of estoppel instruction, providing that a valid extension should be deemed to have occurred if the jury found that the defendants had proved each of the following three elements (which we quote):

> 1.   Ostler manifested to Codman that he had agreed to the proposed extension;
>
> 2.   Codman reasonably believed that Ostler agreed to the proposed extension; and
>
> 3.   either Ostler received a benefit from the extension or Codman relied on the extension to its detriment.

Beyond claiming that such estoppel is barred by section 157, Ostler makes no effort (on this appeal) to show that the estoppel theory is otherwise improper or that its elements were misdescribed to the jury. We thus assume _arguendo_ (section 157 aside) that the quoted elements comprised the proper legal test,

and we direct our attention to the claims that Ostler does make about the instruction--that the jury was wrongly asked to determine whether there was an "agreement" to extend the option period and that the evidence did not support the jury's finding that the three elements had been established.

The first claim is based on the fact that, as a preface to its estoppel instruction, the district court told the jury that it was to decide whether "the deadline was extended by agreement of the parties." Ostler goes on to argue that the issue of agreement was an affirmative defense that defendants had waived by failing to assert it in a timely fashion, Fed. R. Civ. P. 8(c); that it was introduced "out of the blue" by the trial court; and that the circumstances do not constitute an "agreement" under standard contract doctrine.

This argument is a red herring. In context, the reference to "agreement" was a shorthand way of introducing the estoppel concept whose elements the district court then (correctly) specified in the sentences that immediately followed. See Great Lakes Aircraft Co. v. City of Claremont, 608 A.2d 840, 852-54 (N.H. 1992). In detailed objections made after the estoppel instruction was given (including a renewal of the section 157 argument), Ostler's counsel made no objection to the use of the word "agreement," so the objection is waived but

for plain error.  See Fite v. Digital Equip. Corp., 232 F.3d 3, 7-8 (1st Cir. 2000).  Indeed, we would regard it as harmless error even if the issue had been raised and preserved.

As for the claim that evidence was lacking to support the jury's finding, the evidence permitted a jury to find that Codman had told Ostler that it was extending the deadline until July 31; that Ostler did not disavow the extension but instead evaluated the proffered documents and pondered seriously whether to exercise his options up to the last minute; and that this gave Ostler the benefit of additional time and also made it less likely that Codman would take other remedial steps (such as getting formal board approval).  Whatever the merits of the estoppel theory, vis-a-vis section 157, there was no lack of evidence to support the jury's finding.

Ostler argues that under contract doctrine, mere silence in the face of an offer cannot be acceptance and so his failure to disavow was irrelevant.  The authority Ostler cites actually says that silence can constitute consent "where the offeree silently takes offered benefits."  Restatement (Second) of Contracts § 69 cmt. a (1981).  But as we have said, the jury was instructed as to estoppel, not contract.  Estoppel doctrine clearly permits silence to stand for acquiescence in proper circumstances.  E.g., Hilco Prop. Servs., Inc. v. United States,

929 F. Supp. 526, 540 (D.N.H. 1996); <u>Concrete Constructors, Inc.</u> v. <u>Harry Shapiro & Sons, Inc.</u>, 436 A.2d 77, 80 (N.H. 1981).

Finally, concerning the extension issue, Ostler says that the district court erred in excluding three memoranda prepared for or by Codman which, according to Ostler, tended to show that "Codman thought it legally impossible and, financially, prohibitively expensive, to extend the deadline." Whatever its reasons, the district court's exclusion of these documents was harmless. <u>See generally</u> <u>Ruiz-Troche</u> v. <u>Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 87-88 (1st Cir. 1998). Codman officials clearly <u>purported</u> to extend the option period to July 31, and whether or not they privately thought it was legal to do so, the representation to Ostler was all that was required for estoppel purposes.

Ostler's second set of claims in this appeal concern the right under Delaware law of dissenting shareholders in a merger to be bought out at a figure determined by the court. <u>See</u> Del. Cod. Ann. tit. 8, § 262 (1998). In such an appraisal, Ostler says, no discount is applied for minority interest or lack of marketability. <u>See</u>, <u>e.g.</u>, <u>Cavalier Oil Corp.</u> v. <u>Harnett</u>, 564 A.2d 1137, 1142-44 (Del. 1989). The district court excluded expert testimony on appraisal rights under

Delaware law that Ostler sought to offer and it declined to instruct the jury on the issue.

Ostler says that the expert testimony and instruction are relevant because they enhanced the importance of disclosure about any proposed merger with a public company and, in particular, the prospects for a merger with HealthTech. The difficulty is that Codman, in objecting to the testimony and instruction, plausibly proffered that HealthTech would not have agreed to the merger if more than ten percent of Codman's shares dissented and, since Ostler's options represented more than ten percent, there would have been no merger absent a waiver by Ostler of dissenting rights.

Conceivably, Ostler could have made a proffer to the contrary and created a jury issue on the point; and if so, the testimony and instruction Ostler sought as to the rights of dissenting shareholders could have been "conditionally relevant," Fed. R. Evid. 104(b), subject to the court's determination on the disputed issue. However, Ostler made no such tender, and the district court permissibly concluded that there was no foundation for the expert evidence or instruction. Indeed, if there was no prospect of Ostler being able to exercise the rights of a dissenting shareholder, it would have

-12-

been misleading to allow the evidence or instructions.  See Fed. R. Evid. 403.

Ostler's third and last set of claims center on the district court's rulings excluding evidence as to exercise or non-exercise of option rights by three other persons who held options expiring the same date as Ostler's.  Specifically, Ostler says that he wanted to show that two insiders (the chairman of the board and another management official) both chose to exercise their options, while another option-holder who was an outsider declined to exercise his options.  The testimony would have been useful in suggesting, broadly speaking, that the insiders enjoyed access to information that the outsiders had not been given and that this information mattered.

However, Ostler's claims had been narrowed by pretrial rulings to exclude any breach of contract claims grounded in a theory of disparate treatment.  To make any use of inferences from what other option-holders knew and did would have created three mini-trials, exploring just why the other three individuals acted as they did (e.g., the extent to which deferred payment of taxes upon exercise affected the decision to exercise).  Weighing the benefit of this secondary evidence against its potential to delay and mislead is just the kind of issue on which the district court's latitude is at its zenith.

Fed. R. Evid. 403; <u>United States</u> v. <u>Shea</u>, 159 F.3d 37, 40 & n.2 (1st Cir. 1998).  We see no abuse of discretion.

Whether Ostler was fairly treated by Codman may well have been a reasonable subject for dispute, but the debate was resolved by the jury.  We have considered but not discussed other arguments in Ostler's brief, but they are either less persuasive or inadequately developed.

<u>Affirmed</u>.