**FIRST MARBLEHEAD CORP., Plaintiff,**

v.

**Gregory J. HOUSE, Defendant.**

**No. CIV.A. 04–11263PBS.**

United States District Court, D. Massachusetts.

Nov. 18, 2005.

Yonaton Aronoff, Foley & Lardner LLP (N.Y.), New York, NY, for Gregory J. House, Defendant.

Kenneth J. DeMoura, Adler, Pollock & Sheehan, PC, Boston, for First Marblehead Corporation, Plaintiff.

William T. Hogan, III, Hogan, Roache & Malone, Boston, for Gregory J. House, Defendant.

Elizabeth D. Killeen, Hogan, Roache & Malone, Boston, for Gregory J. House, Defendant.

Peter N. Wang, Foley & Lardner LLP, New York, NY, for Gregory J. House, Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## I. INTRODUCTION

This dispute arises out of defendant Gregory House's attempt to exercise stock options granted to him by his employer, plaintiff First Marblehead Corporation. First Marblehead asserts that House's options expired three months after he left First Marblehead, while House contends that the options have a ten-year duration. First Marblehead moves for summary judgment on all claims and counterclaims. After hearing and review of the briefs, the motion is *ALLOWED.*

## II. FACTUAL BACKGROUND

When all reasonable inferences are drawn in favor of the non-moving party, *see Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995), the facts are as follows:

Prior to joining First Marblehead, House had worked in the area of stock options for over ten years. He was employed in the commodity options division of Prudential Bache's New York City office for five years starting in 1982 and in the options trading division of Societe Generale from 1990 to 1993. While self-employed, he wrote a fixed income stock options pricing model. He has also purchased and sold stock options.

House began working at First Marblehead in April 1996 after interviewing with First Marblehead's President, Stephen Anbinder, and its Chief Executive Officer,

Daniel Meyers. As part of the pre-employment discussions, Anbinder and Meyers told House that First Marblehead would be issuing stock options and that House would receive some of them if he came to work for First Marblehead.

In October 1996, First Marblehead's Board of Directors adopted a stock option plan (the "Plan"), which was approved by the shareholders in March 1997. House helped Meyers value the options in the spring of 1997 at Meyer's request. The Plan provides for the grant of "incentive stock options ('Incentive Stock Options'), as defined in section 422 of the [Internal Revenue] Code." (Pl.'s Summ. J.App. Tab D § 4.01.) Section 7.02(d) of the Plan provides:

> Upon the termination of the grantee's employment for reasons other than [death of grantee, retirement or disability, or termination for cause], the Options will remain exercisable by the grantee for a period not extending beyond three months after the date of the termination of employment, but only to the extent of Options which are exercisable as of the date of such termination of employment.

(*Id.* § 7.02(d).) The term "Options" refers to Incentive Stock Options and Nonstatutory Stock Options. (*Id.* § 1.) Under the Plan, a stock option committee (the "Committee") appointed by the Board of Directors determines "the time or times within which ... all or portions of each Option may be exercised." (*Id.* § 2.01–02.) First Marblehead granted options to House and other employees in June 1997.

Also in June 1997, House received a "compensation review" worksheet (the "Worksheet"), which showed his total employment compensation consisting of his salary, benefits, and stock options for 2500 shares of First Marblehead stock. The Worksheet stated:

STOCK OPTIONS
ISO Shares Granted: 2,500
Value of ISO Shares (at $31.25 per share): $78,125

(Pl.'s Summ. J.App. Tab H.) House understood that the term ISO meant incentive stock options.

House also received a two-page memorandum dated July 7, 1997 (the "July 7 Memorandum"), authored by First Marblehead's outside general counsel, which set forth the "principal terms" of the Plan. The memorandum stated that the issued incentive stock options "must be exercised within ten years of the date of grant" and had a strike price of approximately $32 per share. (Pl.'s Summ. J.App. Tab J Part 2.) It outlined a vesting schedule, where 20% of the options would vest immediately and the remainder would vest 20% each year for the following four years. According to the July 7 Memorandum, the vesting of some options could be deferred if the employee's work was unsatisfactory, and all unvested options would terminate in the event of resignation or termination for "cause." (Id.)

The vesting schedule outlined in the July 7 Memorandum conflicted with what House had been told regarding stock options when he interviewed with First Marblehead. During the interview, House had been told that his options were to be fully vested at the time of the grant. House contacted Meyers, who agreed that House's options were not subject to the vesting schedule in the July 7 Memorandum, but were fully vested options upon grant. The parties do not dispute that House had fully vested options at the time his employment terminated.

At some point after the distribution of the July 7 Memorandum, First Marblehead prepared specific stock option grants to its employees. House's grant was dated June 15, 1997, but was never signed by House or Meyers. It stated: "The Option is intended by the parties to be, and shall be treated as, an incentive stock option as such term is defined under Section 422 of the Internal Revenue Code of 1986, as amended." (Pl.'s Compl. Ex. B § 1.) The grant specified that House's options were fully vested options and exercisable immediately. (Id. § 2.01.) House's grant also stated that the options "shall terminate and become null and void after the expiration of ten (10) years from the Date of Grant." (Id. § 3.01.) In language identical to that of the Plan, House's grant also imposed a three-month time limit for exercising the options upon leaving the company. (Compare id. § 3.02(d) with Pl.'s Summ. J.App. Tab D § 7.02(d).)

House quit in February 1998. House saw neither the specific grant of incentive stock options, which was prepared for him, nor the complete Plan as adopted by First Marblehead's Board of Directors prior to his departure. House was never told he had to exercise his incentive stock options within 3 months of termination from his job. House contends that he believed he could exercise his stock options any time within the ten-year period. However, no one at First Marblehead ever told him anything about the time limits for exercise upon the termination of his employment— nor did he inquire.

In February 2004, House contacted First Marblehead and indicated that he wanted to exercise his incentive stock options. On February 27, 2004, First Marblehead declined to honor House's options on the grounds that House's options expired under the Plan when he did not exercise them within three months after leaving First Marblehead.

On May 19, 2004, First Marblehead filed this complaint seeking a declaratory judgment that House's options expired and are

thus null and void. House counterclaimed for breach of contract and promissory estoppel. On July 1, 2005, First Marblehead moved for summary judgment on all claims and counterclaims. After the parties submitted all summary judgment briefs, House amended his answer to add a negligent misrepresentation counterclaim.

### III.  ANALYSIS

#### A.  *Summary Judgment Standard*

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour*, 63 F.3d at 36 (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

#### B.  *Incentive Stock Options*

■ First Marblehead argues that under the Plan, defendant's options are Incentive Stock Options ("ISOs") governed by the Internal Revenue Code, 26 U.S.C. § 422. Section 422(a) requires the holder of an ISO to exercise that option during the holder's employment or within three months of termination of that employment in order to take advantage of the special tax treatment conferred by 26 U.S.C. § 421(a). The Plan stated that the options were ISOs within the meaning of the code, and the July 7 Memorandum informed House that the options he received were ISOs.

The Plan's definition of the options as ISOs governed by the Internal Revenue Code, however, does not conclusively resolve this dispute. The time requirement contained in § 422(a) is not a limit on the exercisability of an ISO but a limit on the availability of the special tax treatment in § 421(a). First Marblehead's Plan recognized that its ISOs may, under certain circumstances, fail to qualify for special tax treatment: "... the tax treatment available pursuant to Section 422 of the Code upon the exercise of an Incentive Stock Option will not be available to a grantee who exercises any Incentive Stock Options more than ... three months after the date of termination ...." (Pl.'s Summ. J.App. Tab D § 7.02(b).) While the three-month limitation of § 422(a) is not dispositive because House is not claiming any special tax treatment, the definition of the option in the grant to House as an "ISO" is relevant in evaluating the merits of the state-law claims, as will be seen below.

## C. *Breach of Contract*

■ First Marblehead contends that the terms of the Plan, specifically its three-month limit for employees who have terminated their employment, govern the exercisability of House's ISOs. From their briefs, both parties appear to agree that Delaware law applies.

■ Delaware law provides that the terms of the options, including the time for exercise, shall be determined by the board of directors subject to the provisions in the certificate of incorporation. In relevant part, § 157 of the Delaware Code states:

(a) Subject to any provisions in the certificate of incorporation, every corporation may create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to acquire from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors.

(b) The terms upon which, including the time or times which may be limited or unlimited in duration, at or within which, and the consideration (including a formula by which such consideration may be determined) for which any such shares may be acquired from the corporation upon the exercise of any such right or option, shall be such as shall be stated in the certificate of incorporation, or in a resolution adopted by the board of directors providing for the creation and issue of such rights or options, and, in every case, shall be set forth or incorporated by reference in the instrument or instruments evidencing such rights or options. In the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and

the sufficiency thereof shall be conslusive [sic].

Del.Code tit. 8, § 157. "Section 157, relating to rights and options respecting stock, requires board approval and a written instrument to create such rights or options." *Grimes v. Alteon, Inc.*, 804 A.2d 256, 260 (Del.2002). The Board of Directors has the "exclusive authority to issue stock and regulate a corporation's capital structure." *Id.* at 261. Delaware law mandates "strict conformity with the statutory requirements for the issuance and sale of stock" even in situations which "might generate an inequitable result." *Liebermann v. Frangiosa,* 844 A.2d 992, 1004 (Del.Ch. 2002).

House argues that the written terms of the grant of the stock option do not govern because the July 7 Memorandum he received states that the options have a ten-year duration. This argument fails for two reasons. First, even if the July 7 Memorandum had provided a ten-year period to exercise an option, under Delaware law, the terms of the instrument approved by First Marblehead's Board of Directors, not the terms of a memorandum and worksheet with arguably conflicting terms, govern the exercisability of options. Second, the July 7 Memorandum merely stated that the options had a ten-year duration. The July 7 Memorandum contained no provisions governing the exercisability of options in the event of termination. Accordingly, this Court allows First Marblehead's motion for summary judgment on the breach of contract counterclaim.

## D. *Promissory Estoppel*

■ Alternatively, House argues that he was entitled to exercise his stock options at prices in 2004 after the company went public under a theory of promissory estoppel. While there is no dispute that House was granted 2500 fully vested options, as

promised, House claims he relied on the language in the Worksheet and the July 7 Memorandum, and its omission to state a time deadline for exercise after termination.

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." Restatement (Second) of Contracts § 90(1) (1981).

■ Under the doctrine of estoppel, minor extensions of an option exercise deadline by management may be permitted to deal with last minute emergencies. *Ostler v. Codman Research Group, Inc.*, 241 F.3d 91, 96 (1st Cir.2001) (holding that estoppel doctrine protects those who rely on corporation officers later found to lack actual authority). Based on *Ostler* and an unpublished Delaware case, one district court used estoppel principles to hold that an affirmative waiver of a 90–day requirement of exercisability of stock options not made by the board of directors was not *ultra vires* under Del.Code tit. 8, § 157. *Wert v. Clear Channel Commc'ns, Inc.*, 345 F.Supp.2d 909, 911–12 (N.D.Ill.2004). However, "corporate law remains fairly fussy about the actual authority of officers when their actions affect stock options." *Ostler*, 241 F.3d at 94; *Wert*, 345 F.Supp.2d at 911 (quoting *Ostler*, 241 F.3d at 94).

This promissory estoppel argument lacks merit. First, no corporate officers made affirmative misrepresentations with respect to the exercisability of time requirements. Second, House was no babe-in-the-option woods; he knew that a writ-

ten grant was necessary, yet he never asked for the written grant or inquired about the terms of the ISO upon leaving. Any reliance on an omission to discuss a post-termination time limit for exercising the stock options in the July 7 Memorandum was unreasonable, particularly in light of the designation of the option as an "ISO," which should have raised a red flag to exercise due diligence and to investigate its terms. Therefore, this Court also allows First Marblehead's motion for summary judgment on the promissory estoppel counterclaim.

### E. *Negligent Misrepresentation*

■ House's negligent misrepresentation claim expires for the same reasons.[1] Under either Delaware or Massachusetts law, a negligent misrepresentation claim requires, inter alia, plaintiff to prove that defendant supplied false information and justifiable reliance by plaintiff on the false information. *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 147 n. 44 (Del.Ch. 2003); *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 60 n. 25, 809 N.E.2d 1017, 1031 n. 25 (2004). As discussed, House has produced no evidence to show justifiable reliance on the omission of the July 7 Memorandum and the Worksheet. Accordingly, this Court allows First Marblehead's motion for summary judgment on the negligent misrepresentation claim.

### *ORDER*

First Marblehead's motion for summary judgment on all claims and counterclaims is *ALLOWED.* (Docket No. 23.)

---

1. Neither party has briefed this claim.