# United States Court of Appeals
## For the First Circuit

No. 07-1549

MARIO MARIASCH,

Plaintiff, Appellant,

v.

THE GILLETTE COMPANY,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]


Before

Lipez, Circuit Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.


Alvin S. Nathanson, with whom Nathanson & Goldberg, PC was on brief for appellant.
Richard P. Ward, with whom David C. Potter and Ropes & Gray, LLP were on brief for appellee.


March 27, 2008

**LIPEZ, Circuit Judge**. In this diversity case, Mario O. Mariasch, a citizen of California, claims that The Gillette Company, his former employer and a Delaware Corporation, wrongfully rejected his attempt to exercise stock options that he acquired in 1995 and 1996 as part of his executive compensation package. After Mariasch retired from Gillette on April 22, 2002, he had three years to exercise these options pursuant to Gillette's 1971 Stock Option Plan ("Stock Option Plan"). Mariasch tried to exercise the options seven days after the three-year period lapsed and was rebuffed by Gillette. He now argues that principles of contract law and equity required Gillette to accept this late exercise.

The district court granted summary judgment for Gillette, primarily on the authority of our decision in First Marblehead Corp. v. House, 473 F.3d 1 (1st Cir. 2006), where we held that Delaware law requires the strict application of the terms and conditions of a board-approved stock option plan. We agree with the district court's analysis and affirm its grant of summary judgment.

                                   **I.**

The following facts are drawn from the pleadings and depositions. Where the facts are disputed, we view the record in the light most favorable to Mariasch, the nonmoving party. First Marblehead, 474 F.3d at 3.

-2-

Before retiring in 2002, Mariasch worked at Gillette for over thirty years, rising to the level of Senior Vice President for New Business Development at Oral-B Laboratories, a Gillette subsidiary. As part of his compensation package for most of his tenure, he received two types of Gillette stock options -- incentive stock options ("ISOs") and non-qualified stock options ("NQSOs").[1] He acquired over 210,000 shares of Gillette stock by exercising these options.

The stock options at issue here are the NQSOs granted to Mariasch in 1995 and 1996. The terms governing the stock options were set forth in the 1971 Stock Option Plan, which provided that active employees must exercise their NQSOs within ten years of the date that the options were issued and that retired employees must exercise their options within three years of their official termination date.[2]

In 2000, as part of Gillette's 1998 Reorganization and Realignment Program, Mariasch's position as a senior vice president was eliminated and his employment was terminated. On July 10, 2000, Mariasch and Gillette entered into a Termination Settlement

---

[1] Under the Internal Revenue Code, ISOs and NQSOs are treated differently for tax purposes, with the former having more favorable tax treatment in exchange for greater restrictions on their use. I.R.C. §§ 421-23.

[2] The Stock Option Plan dictates that if the NQSOs had been issued prior to April 21, 1994, a retiree would have only two years from the termination date to exercise those options.

Agreement ("Termination Agreement") that provided for Mariasch to receive his base pay during the settlement period -- the sixty-eight weeks following his release date. Pursuant to the Termination Agreement, the close of the settlement period, April 22, 2002, would be deemed his termination date and retirement date.[3] Mariasch would then have three months from that date to exercise his ISOs[4] and three years to exercise his NQSOs. The Termination Agreement included a Massachusetts choice-of-law provision.

On April 29, 2005, Mariasch attempted to exercise his disputed NQSOs by contacting the plan agent, Merrill Lynch, who informed him that the options had expired on April 21, 2005. Upon hearing this, Mariasch emailed Gillette, writing, "I made an honest mistake on the due date to exercise two stock options that were due three years after retirement." Mariasch says that he thought his retirement date was May 1, 2002 because in 2002 he received a pay stub that listed May 1, 2002 to May 31, 2002 as a payment period. Also, Mariasch states that he failed to exercise the disputed NSQOs before the expiration date because he did not receive the usual "friendly reminder" letter or a call from either Gillette or

---

[3] Although Mariasch's departure was not voluntary, the parties agree that Mariasch's departure would be treated as a retirement for the purposes of the Stock Option Plan. Both parties use termination date and retirement date interchangeably.

[4] Mariasch exercised his ISOs in a timely manner and there is no dispute regarding these options.

-4-

Merrill Lynch telling him that they were about to expire. He asserts that Gillette had sent him a "friendly reminder" letter prior to the expiration of stock options for over twenty years and then abruptly stopped sending him a reminder in 2005.

After Gillette persisted in its refusal to allow him to exercise his 1995 and 1996 options, Mariasch filed suit against Gillette in the federal district court in Boston. On assorted theories, he sought a declaratory judgment that he should be permitted to exercise the disputed options. After Gillette moved for summary judgment, the district court granted the motion, largely on the basis of our prior decision in First Marblehead. Mariasch now appeals.

## II.

We review the district court's grant of summary judgment de novo. First Marblehead, 473 F.3d at 5. Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); First Marblehead, 473 F.3d at 5. "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank

-5-

speculation."  Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir. 2005).

## A. Choice-of-Law

In this diversity case we must follow the applicable state laws.  See, e.g., Phoung Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir. 2007).  The parties dispute which state's laws should apply, with Mariasch contending that Massachusetts law applies to his claim and Gillette responding that Delaware law applies.  To determine which state's laws are applicable, we look to the choice-of-law jurisprudence of Massachusetts, the forum state.  Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 46 (1st Cir. 2003)("In determining what state law is relevant, a federal court must apply the choice-of-law framework of the forum state.").

Massachusetts applies the internal affairs doctrine, which "recognizes that only one State should have the authority to regulate a corporation's internal affairs - matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders - because otherwise a corporation could be faced with conflicting demands." Edgar v. MITE Corp., 457 U.S. 624, 645 (1982).  The state with authority over a corporation's internal affairs is the state of incorporation. Harrison v. NetCentric Corp., 744 N.E.2d 622, 628 (Mass. 2001) ("Traditionally, we have applied the law of the State of

-6-

incorporation in matters relating to the internal affairs of a corporation . . . ."); see also Mass. Gen. Laws ch. 156D, § 15.05(c) ("[A] foreign corporation organization and internal affairs and the liability of its stockholders and directors shall be governed by the laws of the jurisdiction under which it is organized."). Since Gillette was incorporated in Delaware, Gillette's internal affairs are governed by Delaware law.

Mariasch's claims fall within the purview of the internal affairs doctrine because stock option plans are considered matters pertaining to the internal affairs of a corporation. In Rogers v. Guaranty Trust Co. of New York, the Supreme Court decided that the plaintiff's claims must be assessed under New Jersey law, the state in which the defendant corporation was incorporated, because "[u]nquestionably the steps taken and proposed to formulate and carry out the [stock option] plan constitute the conduct and management of the internal affairs of the [] company." 288 U.S. 123, 129 (1933); see Fredericks v. Georgia-Pacific Corp., 331 F. Supp. 422, 424 (E.D. Pa. 1971) (explaining that when a stock option plan is silent as to the applicable state law, courts have uniformly determined the validity and construction of stock options by applying the laws of the state of incorporation); Ellis v. Emhart Mfg. Co., 191 A.2d 546, 550 (Conn. 1963) ("The issuance of stock option plans by the defendant involves its internal affairs, and any controversy resulting therefrom is controlled by [the law of the

-7-

state of incorporation].");  Beard v. Elster, 160 A.2d 731, 735 (Del. 1960) ("The issuance of stock option plans by Delaware corporations involves the internal affairs of a Delaware corporation and is, therefore, controlled by the laws of Delaware.").  Here, as defendant argues, "Gillette's shareholders specifically approved how many shares of Gillette stock could be issued under the 1971 Stock Option Plan.  Thus, issues relating to when one is entitled to the issuance of stock pursuant to the 1971 Stock Option Plan affects Gillette's relationship with the shareholders."

Nonetheless, Mariasch argues that the Stock Option Plan is not subject to the internal affairs doctrine and the law of Delaware since it was incorporated by reference into the Termination Agreement, which says that "[t]his Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts."  Gillette correctly responds that Mariasch had the benefits provided by the Stock Option Plan prior to becoming party to the Termination Agreement.  The purpose of the Termination Agreement was to provide him with settlement pay and other benefits that he did not previously have.  As Gillette puts it, "The additional pay and benefits were the consideration for a release of all claims."  Rather than incorporating the Stock Option Plan or modifying its terms in any way, the Termination Agreement simply referred to it "for detailed information on the exercise of Stock Options."  The Termination Agreement did delay Mariasch's retirement

date, which had the effect of giving him more time to exercise his options that had to be exercised within three years of retirement. That limited interaction between the Termination Agreement and the Stock Option Plan is a far cry from the incorporation that Mariasch claims. Consistent with the internal affairs doctrine, we must apply Delaware law when assessing Mariasch's claim that Gillette should have permitted him to exercise his options beyond the expiration date for such exercise.[5]

## B.   Applicability of First Marblehead

We addressed the law of Delaware as it applies to the timely exercise of stock option plans in First Marblehead. There, Gregory House, pursuant to a board-approved plan, had to exercise his ISOs within three months of resigning from First Marblehead Corporation. Id. at 3. Although House allowed the three month period to lapse, he sought to exercise his options several years later. Id. at 4. First Marblehead sought a declaratory judgment

---

[5] Mariasch also argues that because the Termination Agreement is a bilateral contract and the Stock Option Plan is incorporated by reference, the disputed NQSOs are subject to the terms of a bilateral contract. According to Mariasch, the deadlines in a bilateral contract are strictly enforced only if the contract explicitly states that time is of the essence. Since the Termination Agreement has no such language, Mariasch argues that the deadlines set forth in the Stock Option Plan and incorporated by reference into the Termination Agreement should not be strictly enforced. However, since we find that the Termination Agreement does not incorporate the Stock Option Plan by reference and Mariasch's interests in the disputed NQSOs are only subject to the terms of the Stock Option Plan, we reject the bilateral contract argument on this basis alone.

that House's ISOs had expired three months after his resignation and House filed a cross-complaint alleging that he should be permitted to exercise his options on contractual and equitable grounds. Id. After House lost at summary judgment, he appealed to us. Id. at 5.

In rejecting his contractual and equitable claims,[6] we noted that, pursuant to Delaware law, "every corporation may create and issue . . . rights or options . . . such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors." Del. Code Ann. tit. 8, § 157(a); see First Marblehead, 473 F.3d at 6. We added that Delaware courts have observed that the issuance of corporate stock pursuant to a written board-approved plan is "an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters." First Marblehead, 473 F.3d at 6 (quoting STAAR Surgical Co. v. Waggoner, 588 A.2d 1130, 1136 (Del. 1991)). Relatedly, the strict enforcement of a board-approved stock issuance plan serves the important policy of "preserv[ing] the board's broad authority over the corporation and . . . protect[ing] the certainty of investors' expectations regarding stock." Id. (quoting Grimes v. Alteon, Inc., 804 A.2d 256, 258 (Del. 2002)). Therefore, Delaware courts have denied

_____

[6] House also raised successfully a negligent misrepresentation claim that has not been advanced by Mariasch. First Marblehead, 473 F.3d at 9-11.

-10-

claims for equitable relief "even in situations when that might generate an inequitable result" because of the importance of strict adherence to statutory requirements regarding the issuance of stock. Id. (quoting Liebermann v. Frangiosa, 844 A.2d 992, 1004 (Del. Ch. 2002)).

Here, the Stock Option Plan provides for a Personnel Committee with the authority to award ISOs and NQSOs to employees of Gillette and its subsidiaries. In limited circumstances set forth in the Stock Option Plan, the Personnel Committee can extend the period in which an optionee may exercise his options.[7] However, the period within which a retired employee can exercise his NQSOs is not subject to an extension by the Personnel Committee. The Stock Option Plan provides without exception that retired employees with NQSOs have three years from the date of termination to exercise their options.

For all of the reasons cited in First Marblehead, this option period must be strictly enforced.[8] Requiring Gillette to allow a deviation from the terms of the Stock Option Plan would undermine the board's authority over the issuance of stocks, thereby creating unpredictability for investors in contravention of Delaware

---

[7] For example, the Stock Option Plan allows the Personnel Committee to extend the period in which a voluntarily terminated employee can exercise his NQSOs from seven days to three months.

[8] Sensibly, Mariasch does not argue that First Marblehead is distinguishable on the ground that ISOs were at issue there as opposed to the NQSOs at issue here.

-11-

law.  Moreover, it would limit the Personnel Committee's ability to allocate stock options to employees.  Under the Stock Option Plan, the reserved shares become subject to future grants when stock options expire.  If the deadlines for exercising stock options were not strictly enforced, the Personnel Committee would not know how many shares were available for grant.

Mariasch argues that <u>First Marblehead</u> does not apply to his claims because the Stock Option Plan does not include a fixed option period that must be strictly enforced.  To support this odd notion, he cites the word "may" in the clause which says that options "exercisable at the time of the termination, <u>may</u> be exercised within the period shown below" (emphasis added).  In his view, the word "may" means that the Personnel Committee had the right to extend the three-year period for the exercise of NQSOs by retired employees.[9]  This argument is unpersuasive.  The word "may" does not make the length of the option period permissive.  Rather,

---

[9] Mariasch also argues that the Personnel Committee could have extended the exercise period for the disputed NQSOs to ten years. He cites provisions from the Stock Option Plan in support of his position, but these provisions are not applicable by their own terms.  The Stock Option Plan says: "Options granted to employees are exercisable as determined by the Committee, except that the maximum option period is ten years from the date of grant."  This reference to the ten-year option period pertains exclusively to current employees and not retired employees like Mariasch. Similarly, Mariasch quotes language that gives the Personnel Committee authority to extend exercise periods to ten years for employees who were discharged for cause.  This provision is also inapplicable to Mariasch since his termination was characterized as a retirement.

that word simply gave Mariasch the choice during the three-year period to exercise his options. Mariasch had no contractual right under Delaware law to exercise his NQSOs after the three years lapsed.

**C. Equitable Claims**

We also apply Delaware law to Mariasch's equitable claims. In <u>First Marblehead</u> we acknowledged that, in limited circumstances, Delaware law might, on equitable grounds, permit a brief extension in a stock option period which the corporation should be estopped from denying. <u>Id.</u> at 8 (citing <u>Ostler</u> v. <u>Codman Research Group, Inc.</u>, 241 F.3d 91, 94 (1st Cir. 2001), where we validated a two-day extension of the stock option exercise deadline while noting that such "minor extension[s] of an option exercise deadline . . . . to cope with last-minute emergencies" were rarely allowed); <u>cf.</u> <u>id.</u> (denying House's request for an extension because "[w]hile a two-day extension arguably would not frustrate management's ability to make capital decisions with certainty, a delay of years could have a significant impact"). Mariasch contends that the circumstances in this case justify a brief extension of the option period. Gillette, he says, engaged in inequitable conduct when it ceased to provide him notice of the option exercise deadline after twenty years of providing such notice. He also emphasizes that he is only asking for a seven-day grace period.

By virtue of his own testimony, Mariasch defeats his claim of equitable estoppel. At his deposition, Mariasch was presented with a letter dated March 21, 2002 from Gillette. The first sentence read, "I have enclosed your retirement package as of April 22, 2002." When questioned whether he understood that his retirement date was April 22, 2002, Mariasch responded affirmatively. Gillette's counsel later asked Mariasch, "But, when you retired, you understood that you had to exercise them [the 1995 and 1996 NQSOs] within three years of your retirement date, right?" Mariasch once again answered in the affirmative. Moreover, when Mariasch attempted to exercise his disputed NQSOs by contacting the plan agent, Merrill Lynch, who informed him that the options had expired on April 21, 2005, he emailed Gillette the following message: "I made an honest mistake on the due date to exercise two stock options that were due three years after retirement."

Under Delaware law, "[t]o establish estoppel it must be shown that the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question." Waggoner v. Laster, 581 A.2d 1127, 1136 (Del. 1990). Based on Mariasch's deposition testimony and the content of the email Mariasch sent to Gillette, it is clear that Mariasch knew that the disputed options lapsed on April 21, 2005. Mariasch must bear the

responsibility for not acting on that knowledge.[10]  He cannot impose

the cost of his mistake on Gillette.[11]

Affirmed.

---

[10] Mariasch's equitable estoppel claim fails on other grounds as well.  As noted earlier, Mariasch claims on appeal that he failed to exercise the disputed NSQOs before the expiration date because he did not receive the usual "friendly reminder" letter or a call from either Gillette or Merrill Lynch telling him that they were about to expire.  He asserts that Gillette had sent him a "friendly reminder" letter prior to the expiration of stock options for over twenty years and then abruptly stopped sending him a reminder in 2005.  However, by his own admission, he was not waiting for a "friendly reminder" when he attempted to exercise his options on April 29, 2005.  Thus, his equitable estoppel claim predicated on alleged reliance on receiving "friendly reminders" from Gillette is unavailing.

[11] Citing Delaware cases for the proposition that "equity abhors a forfeiture," see, e.g., Hillman v. Hillman, 903 A.2d 798, 812 n.43 (Del. Ch. 2006), Mariasch argues that he is entitled to equitable relief from the forfeiture of his stock options.  We disagree for the same reason that Mariasch does not prevail on his equitable estoppel claim -- he is responsible for his own loss.